J-A20038-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: L.J.J., AN ALLEGED INCAPACITATED PERSON | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: H.A.E., ESQUIRE | : | No. 223 WDA 2021 |

Appeal from the Order Entered January 21, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  No. 02-20-01558

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                **FILED: OCTOBER 20, 2021**

H.A.E., Esquire (Appellant), appeals from the order entered in the Allegheny County Court of Common Pleas, Orphans' Court, granting a demurrer and denying his emergency petition to adjudicate L.J.J. an incapacitated person and to appoint a guardian for her estate.  Appellant argues the orphans' court abused its discretion by: improperly weighing the evidence presented by L.J.J.'s own expert witness; failing to direct the guardian *ad litem* to evaluate L.J.J.; and failing to order an independent evaluation of L.J.J.  We affirm.

### I.  Facts & Procedural History

Appellant, an attorney, began performing estate planning for L.J.J. and her husband in 2012.  N.T., 9/11/20, at 8.  The coupled lived in a house they owned, valued at $250,000, in Pittsburgh.  *Id.* at 17, 27-28.  They also owned a second house, "one street over," valued at $150,000, occupied by their daughter, J., who received Social Security disability income.  *Id.* at 11, 15,

17. J., in turn, has two adult children, R. and M. (L.J.J.'s granddaughters). L.J.J.'s husband died in December of 2016. R. was granted financial and medical power of attorney over L.J.J. in September of 2018. Additionally, R. moved into L.J.J.'s home in September or October of 2019 and became her sole caregiver.[1] *Id.* at 27.

On March 13, 2020, Appellant filed, *pro se*, the underlying emergency petition to adjudicate L.J.J. incapacitated, to freeze her assets, and to appoint a guardian of her estate. At this time, L.J.J. was 92 years old. The emergency petition alleged: (1) L.J.J. was suffering from "lack of judgment and insight," the inability to manage her financial affairs, and manipulation by family members; (2) R. unduly influenced L.J.J. to transfer or withdraw approximately $221,000 and $168,000 from two checking accounts, which were jointly titled in L.J.J.'s and both granddaughters' names; and (3) R. influenced L.J.J. to transfer ownership of both houses to R. individually.[2] L.J.J. did not file any response to Appellant's petition.

The orphans' court conducted a hearing on March 17, 2020, at which Appellant appeared *pro se* and L.J.J. with court-appointed counsel. Appellant

_____

[1] At some point, R.'s boyfriend also moved into L.J.J.'s home. N.T., 3/17/20, at 28.

[2] L.J.J. also had an IRA in the amount of $56,000 and a "small miscellaneous account of $5,000." N.T., 9/11/20, at 17. Together with the real properties and bank accounts, L.J.J.'s total assets were worth $900,000 to $1 million.

argued that over 7½ years of discussions and four updated wills, L.J.J. and her husband's consistent intention was to leave their estate equally to the two granddaughters. N.T., 3/17/20, at 9. However, under R.'s "confidential relationship and power of attorney," there was now "a vast switch[, in which] everything is to go to" R instead. *Id.* at 9-10. L.J.J. acknowledged that her will would have given her house to her granddaughters equally, but, she testified, she has changed her mind. *Id.* at 21-22. L.J.J. stated, "I want it to go to my granddaughter [R.] who is the only person that I can trust in my family. The only one." *Id.* at 23. L.J.J. stated she "not leaving any money to" her other granddaughter M., who "is not trustworthy because she is under the influence of her husband," "had written herself a $28,000 check," and hid "a camera and a speaker" behind a lamp by her seat in the family room. *Id.* at 29, 33. Furthermore, L.J.J. did not trust her daughter, J., who "had the Ross Township police come to [her] house at least two or three times and accuse [her] of being crazy[.]" *Id.* at 31.

The orphans' court continued the proceedings and appointed a guardian *ad litem* for L.J.J., former Judge Robert Gallo, Esquire (GAL) — whom the parties had agreed upon should the court appoint a GAL. *See* N.T., 3/17/20, at 36; Order, 3/18/20.

Both parties filed expert reports. L.J.J.'s expert, Tod Marion, Ph.D., evaluated L.J.J. on July 29, 2020, at her home. His report opined that L.J.J. was **not** incapacitated, she did not require an emergency guardian, she

"scored in the normal range of intellectual ability," she "is capable of managing her own finances," and "the most appropriate, least restrictive living situation for" L.J.J. was to live at home with a part-time home health aide. Tod Marion, Ph.D.'s Expert Report, 9/9/20, at 2, 4.

Appellant's expert, Bruce Wright, M.D., did not examine L.J.J., as either L.J.J. refused to meet with him or L.J.J.'s counsel denied permission for such an evaluation. N.T., 9/11/20, at 47-48. However, Dr. Wright met with Appellant and reviewed L.J.J.'s medical records of the past eight years, Dr. Marion's expert report, and Appellant's emergency petition. Dr. Wright opined, *inter alia*, that based on the available information, L.J.J. "has cognitive impairment," but absent an examination, he could not "determine a precise diagnosis." Bruce Wright, M.D.'s Expert Report, 9/8/20, at 2.

The orphans' court conducted a second hearing on September 11, 2020, at which both parties now appeared with counsel.[3] L.J.J.'s counsel argued that Appellant "should [start] with [a] presentation of . . . medical evidence," as the case may not "need[ ] to go any further once that's presented." N.T., 9/11/20, at 5. However, L.J.J.'s counsel later conceded that L.J.J. refused to meet with Appellant's expert. *Id.* at 47-48 (in response to Appellant's claim

---

[3] L.J.J. appeared at the September 11, 2020, hearing with a different, privately retained attorney.

that L.J.J.'s counsel refused permission for such an evaluation). It is not disputed that Appellant did not present any medical evidence concerning L.J.J.

The sole witness was Appellant, who testified to the following. From 2012 through 2018, he "tweaked" L.J.J. and her husband's estate planning several times, but their intent was consistently as follows: to provide funds and the second house for J. to live in during her life, and ultimately to leave the two houses and remaining estate equally to the granddaughters. N.T., 9/11/20, at 9, 11-12, 14. Following her husband's death, L.J.J. owned both homes in her name only. *Id.* at 16. By November of 2019, L.J.J.'s bank accounts were jointly titled in her and both granddaughters' names. *Id.* at 26.

As stated above, R. had obtained medical and financial power of attorney over J.L.L in September of 2018. In September or October of the following year, R. moved into L.J.J.'s home.[4] N.T., 9/11/20, at 27. Around the same time, M.'s mother-in-law provided in-home care for L.J.J. *Id.* at 26. However, "[t]hey did not get along," the mother-in-law was discharged, and R. became the sole caregiver. *Id.* at 27. Meanwhile, L.J.J. gave $10,000 to M. so that she and her husband could buy a home. *Id.* (closing on the home was to be held in January of 2020). As late as November of 2019, L.J.J. expressed to Appellant her continued desire for the second house to be placed

_____

[4] R.'s boyfriend also lived in L.J.J.'s home. N.T., 3/17/20, at 28.

in a "special needs trust" for J. to use during her lifetime, with the remainder of L.J.J.'s estate to go to the two granddaughters equally. *Id.* at 14, 26.

On January 3, 2020, however, L.J.J. told Appellant for "the first time . . . that she wanted to transfer her main house to" R. N.T., 9/11/20, at 27. Appellant informed the other granddaughter, M., who "was surprised," but responded "if that's grandma's desire, then so be it. I won't interfere[.]" *Id.* at 28, 29. On January 21st, Appellant met L.J.J. at her home for one hour. *Id.* at 30. L.J.J. understood that she was transferring title to R. *Id.* at 30. Appellant completed the deed transfer, from L.J.J. individually to L.J.J. and R. as joint tenants with right of survivorship. *Id.* at 53. According to Appellant, neither granddaughter, nor the daughter J., knew about this meeting or deed transfer. *Id.*

On February 4, 2020, L.J.J. left a voice message for Appellant, requesting he "prepare a quitclaim deed to transfer her house into [R.'s] name." N.T., 9/11/20, at 30-31. Appellant believed "something was wrong. [He] couldn't understand how [L.J.J.] had completely forgotten [that] two weeks prior," he visited her house and she executed the deed. *Id.* at 31. Appellant did not believe L.J.J. "had any comprehension that it had been completed." *Id.* This call was made on R.'s cell phone, and Appellant believed "it sounded as if [L.J.J.] was reading a script." *Id.* at 33. Subsequently, **both** houses — L.J.J.'s home and her daughter's home — were transferred to R. as sole owner by quitclaim deed, prepared by another attorney. *Id.* at 44.

Shortly thereafter, on February 18, 2020, Appellant learned the following. L.J.J., R., and R.'s boyfriend went to First National Bank and withdrew approximately $168,000 — "essentially all of [the] funds from the three-way account" jointly owned by L.J.J., R., and M. N.T., 9/11/20, at 34, 37. Appellant believes this money was placed "into another account" that did not include M. *See id.* at 38. On the same day, L.J.J., R. and R.'s boyfriend also went to a PNC Bank and attempted to withdraw funds from a joint account there. *Id.* M. was at the bank and called Appellant.[5] At Appellant's request, M., as a joint owner of the account, withdrew $221,041.79, and PNC Bank executed a check payable to Appellant's solo law firm, so that he could deposit the money to his attorney IOLTA account. *Id.* at 39-40. As of the September 11, 2020, hearing, this money remained in Appellant's IOLTA account. *Id.* at 40.

Appellant then requested the Ross Township Police Department to conduct a "Health & Comfort inspection" and accompany him to visit L.J.J. N.T., 9/11/20, at 40-41. A police officer thus escorted Appellant to L.J.J.'s home on February 19, 2020, the day after the bank withdrawals. *Id.* at 41. L.J.J. told Appellant she had signed a deed on February 17th. *Id.* When Appellant reminded L.J.J., "[W]e had already transferred the house[,]" L.J.J.

---

[5] The notes of testimony do no indicate when or how M. came to be at the PNC Bank. *See* N.T., 9/11/20, at 38.

had "no recollection of" signing the deed one month earlier. ***Id.*** As stated above, at some point, L.J.J. also transferred ownership of the second house — in which her daughter J. lived — to R. individually. ***Id.*** at 44. Appellant filed the *pro se* emergency petition on March 13th.

Throughout the above testimony, L.J.J.'s counsel argued that Appellant had not presented any evidence of L.J.J.'s incapacity, and instead Appellant's testimony went to a will contest, not the issue of guardianship. N.T., 9/11/20, at 9, 13, 40, 47. L.J.J.'s counsel further argued that Appellant's expert's report was "void because the doctor never examined" L.J.J. and thus "cannot speak or address [L.J.J.'s] functions [or] ability." ***Id.*** at 51. L.J.J.'s counsel further pointed out that Appellant's expert was not provided with L.J.J.'s testimony at the March 17, 2020, hearing. ***Id.***

Appellant responded, *inter alia*, that L.J.J.'s own expert's report, by Dr. Marion, recommended that L.J.J. "needs someone independent [and separate from her granddaughters] to manage her finances," and "essentially asks for the [GAL] to act as an independent guardian to oversee her affairs to establish what . . . she wants[.]"[6] N.T., 9/11/20, at 55-56. L.J.J.'s counsel responded this characterization of the report was "absolutely false," and instead, Dr. Marion found L.J.J. was **not** incapacitated and "[t]he only assistance that

_____

[6] Appellant presents the same argument on appeal, which we address ***infra***.

[L.J.J.] needs is some physical assistance and daily activities in the home." ***Id.*** at 56.

L.J.J.'s counsel thus made an oral motion for demurrer and dismissal, which the orphans' court granted in open court. N.T., 9/11/20, at 54, 59. The court reasoned that Appellant provided no medical testimony, nor any evidence of incapacity. ***Id.*** at 46, 58. The court agreed that Appellants' evidence and arguments related to a will contest, not guardianship. ***Id.*** When Appellant's counsel denied this matter was a will contest, the court reasoned, "That's where it's going to go. You know that as well as I do." ***Id.*** at 59.

The orphans' court also executed the proposed written order, submitted by L.J.J.[7] Pertinently, the court **struck** the last sentence in L.J.J.'s draft order: "[Appellant] shall immediately return the amount of $221,041.79 to [L.J.J.]," meaning the court did **not** order such return. ***See*** Order, 9/18/20.

On October 16, 2020, Appellant filed a motion for reconsideration, requesting the court to direct the GAL "to engage in the evaluation and counseling recommended by" L.J.J.'s expert. Appellant's Mot. for Reconsideration, 10/16/20, at 5. On October 20th, the orphans' court granted reconsideration and directed the GAL to meet with L.J.J. and "assess her

---

[7] The text of this order states the date September 11, 2020, but the order is stamped as "filed" on September 18th. The electronic certified record on appeal does not include any official trial docket, but rather only an "index," which likewise shows the order was "filed" on September 18, 2020. For citation purposes, we use this September 18th date.

judgment, insight, memory, and overall capacity, and shall, as suggested by [Dr. Marion's report,] assess her susceptibility to influence by her granddaughters or any other person." Order, 10/20/20. On October 23rd, L.J.J. filed a motion to stay the reconsideration order.

The orphans' court conducted a hearing on January 14, 2021. L.J.J.'s counsel argued that where Appellant's emergency petition was dismissed "by demurrer based on a complete inability to sustain a burden of proof," his "entire" reconsideration argument was improperly "based on facts that are established." N.T., 1/14/21, at 5. Counsel further argued that Appellant's requested relief — further evaluation of L.J.J. — was "an invasion of [L.J.J.'s] privacy" and not supported by fact or any legal authority. *Id.* at 6.

On January 21, 2021, the orphans' court entered the underlying order, which essentially vacated its reconsideration order and reinstated its denial of Appellant's emergency petition. Appellant filed a timely notice of appeal on February 12th, and subsequently complied with the court's order to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Meanwhile, on February 24th, L.J.J. filed a motion for return of the $221,041.79 funds that were in Appellant's IOLTA account. In response, on March 29th, the court ordered Appellant to issue a check in that amount to the orphans' court, to be held pending further order of the court. Order, 3/29/21.

## II. Statement of Questions Involved

Appellant presents three issues for our review:

I. Did the orphans' court abuse its discretion and err as a matter of law in granting a non-suit when the court had failed to consider the substantial weight of evidence, including that provided by [L.J.J.'s] own expert, that [L.J.J.] was susceptible to undue influence, confused, and memory impaired, and that her real property and accounts had recently been retitled or converted to ownership by others resulting in substantial risk to her immediate and future financial security?

II. Did the orphans' court abuse its discretion and err as a matter of law in granting a non-suit when the court had failed to exercise its statutory and equitable authority to direct the guardian *ad litem* to engage in an evaluation of [L.J.J.] in light of the substantial evidence of her impaired condition, her susceptibility to influence, and the acts of conversion and undue influence perpetrated upon her by others?

III. Did the orphans' court abuse its discretion and err as a matter of law in granting a non-suit when the court had failed to exercise its statutory and equitable authority to order an independent evaluation of [L.J.J.] in light of the substantial evidence of her impaired condition, her susceptibility to influence, and the acts of conversion and undue influence perpetrated upon her by others?

Appellant's Brief at 4.

## III.  Standard of Review & Statutory Authority

We first note the standard of review and relevant authority.

"'In reviewing the decision of the orphans' court, our task is to assure that the record is free from legal error and to determine if the chancellor's findings are supported by competent and adequate evidence, and are not predicated upon capricious disbelief of competent and credible evidence.'"  Our standard of review with respect to the factual findings of the auditing judge is clear: "'The credibility of the witnesses and the weight to be given their testimony is in the first instance to be determined by the auditing judge.  His [or her] findings of fact, affirmed by the court *en banc*, like those of a jury, are conclusive unless they are unsupportable by the record.'"

- 11 -

*In re Estate of Duran*, 692 A.2d 176, 178 (Pa. Super. 1997) (citations omitted).

Although L.J.J. made an oral motion for a demurrer here, and did not file preliminary objections, we find instructive the following authority regarding demurrers:

> Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

*See Richmond v. McHale*, 35 A.3d 779, 783 (Pa. Super. 2012) (citations omitted).

Chapter 55 of our Probate, Estates and Fiduciaries Code[8] governs incapacitated persons. Section 5501 defines an "incapacitated person" as "an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety." 20 Pa.C.S. § 5501. The stated purpose of the Code is as follows:

---

[8] 20 Pa.C.S. §§ 5501-5555.

> Recognizing that every individual has unique needs and differing abilities, it is the purpose of this chapter to promote the general welfare of all citizens by establishing a system which permits incapacitated persons to participate as fully as possible in all decisions which affect them, which assists these persons in meeting the essential requirements for their physical health and safety, protecting their rights, managing their financial resources and developing or regaining their abilities to the maximum extent possible and which accomplishes these objectives through the use of the least restrictive alternative; and recognizing further that when guardianship services are necessary, it is important to facilitate the finding of suitable individuals or entities willing to serve as guardians.

20 Pa.C.S. § 5502.

Section 5511(a) provides that a court, upon petition, a hearing, and "the presentation of clear and convincing evidence, may find a person . . . to be incapacitated and appoint a guardian or guardians of his person or estate." 20 Pa.C.S. § 5511(a). "The court may dismiss a proceeding where it determines that the proceeding has not been instituted to aid or benefit the alleged incapacitated person or that the petition is incomplete or fails to provide sufficient facts to proceed." *Id.* Section 5518 governs the evidentiary burden for a finding of incapacity:

> To establish incapacity, the petitioner **must present testimony**, in person or by deposition **from individuals qualified by training and experience in evaluating individuals with incapacities** of the type alleged by the petitioner, which establishes the nature and extent of the alleged incapacities and disabilities and the person's mental, emotional and physical condition, adaptive behavior and social skills. The petition must also present evidence regarding the services being utilized to meet essential requirements for the alleged incapacitated person's physical health and safety, to manage the person's financial resources or to develop or regain the person's abilities; evidence regarding the types of assistance required by the person and as

- 13 -

to why no less restrictive alternatives would be appropriate; and evidence regarding the probability that the extent of the person's incapacities may significantly lessen or change.

20 Pa.C.S. § 5518 (emphasis added).

### IV. Weight of Parties' Expert Reports

In his first issue, Appellant avers the trial court abused its discretion and erred in weighing the evidence to conclude L.J.J. is not incapacitated. First, Appellant cites his own "uncontradicted and credible testimony" about L.J.J.'s "increasingly impaired cognition," as well as R.'s actions that "violated her fiduciary duty to avoid self-dealing as an agent." Appellant's Brief at 18, 21. Appellant also points to the "uncontradicted evidence" that R. converted to her own ownership L.J.J.'s real estate and "a substantial portion of her liquid assets." *Id.* at 21. Appellant acknowledges he was unable "to acquire sufficient medical testimony" about L.J.J., but avers both his own and L.J.J.'s expert reports opine that L.J.J. is "cognitively and memory impaired, and susceptible to the influence of her granddaughters." *Id.* at 20-21. We conclude no relief is due.

Here, the orphans' court considered Appellant's claim that L.J.J. was being manipulated by her granddaughter R., but found credible L.J.J.'s testimony that R. was "the only person in the family that she can trust."

Orphans' Ct. Op. at 1 (unpaginated),[9] *citing* N.T., 3/17/20, at 24. With respect to the parties' expert reports, the court noted both experts have been qualified as experts "many times" before it. Orphans' Ct. Op. at 2, 3. The court credited the report of L.J.J.'s expert, Dr. Marion, who evaluated L.J.J. the court summarized:

> [Dr. Marion] stated that [L.J.J.] scored in the normal range of intellectual ability on the Montreal Cognitive Assessment. He found that [L.J.J.] "is capable of receiving and evaluating information effectively and making and communicating decisions to meet her essential requirements for both her person and her finances. As such, "a guardian for her estate is not necessary."

Orphans' Ct. Op. at 3.

It is not disputed that Appellant failed to present medical or expert testimony about L.J.J.'s alleged incapacity, as required by Section 5518. We acknowledge L.J.J.'s self-serving argument, where she refused to meet with Appellant's expert but then argued Appellant failed to present any medical testimony. *See* N.T., 9/11/20, at 5, 48. Furthermore, L.J.J.'s counsel argued that an evaluation, by the GAL or any evaluator, would be "an invasion of privacy." N.T., 1/14/21, at 6. However, we have not discovered any legal authority for this proposition — that an anticipated invasion of privacy may prevent an interested party, or a court, from investigating whether a person is indeed suffering from incapacity under the Code.

---

[9] In our citation to the orphans' court opinion pages, we do not include the cover page.

In any event, the orphans' court acknowledged, twice in its opinion, that L.J.J. "refused to be" evaluated by Dr. Wright and presented additional reasoning for denying Appellant's emergency petition. Orphans' Ct. Op. at 2, 3. The court credited the report of L.J.J.'s expert, Dr. Marion, which specifically opined L.J.J. was not incapacitated, "[s]he is capable of managing her own finances," and "she scored in the normal range of intellectual ability." *See* Dr. Marion's Expert Report at 2, 4. Furthermore, our review of the report reveals that Dr. Marion marked L.J.J. as "Unimpaired" in the following list of cognitive skills: receiving and evaluation information effectively; communicating decisions; ability to give informed consent; short-term memory, long-term memory, "[m]anaging finances (including paying bills, making deposits, withdrawals and working with financial institutions)," managing health care, and "ability to resist scams." *Id.* at 3. The only skills that Dr. Marion marked as "needs some help" are "[a]ctivities of daily living" and "[p]roviding for physical safety." *Id.*

We consider Appellant's claims that Dr. Marion found L.J.J. is "significantly cognitively impaired" and "susceptible to influence," and that Dr. Marion recommended further evaluation. *See* Appellant's Brief at 11. He relies on portions of the expert's narrative report. We set forth the cited statements in their full context:

> [L.J.J.] clearly has some strong feelings regarding her daughter and one granddaughter. But it seems like the anger is relatively new. [T]hings started to deteriorate at some time within the last year. As [Appellant] noted, both granddaughters seem to be

- 16 -

independently working for the better situation for themselves individually. They both compromised [L.J.J.] by having dual roles with her including caregiving roles, and recipients of her funds. **These dual roles make it harder for anyone, especially someone like [L.J.J.] who is vulnerable due to her age, need for care, difficulty seeing and hearing, to remain objective, and can be easily influenced.**

**But [L.J.J.] is entitled to her opinion.** She has clear reasons for why she wants to remove one of the granddaughters from accounts and her will and she has strong feelings regarding creating trusts. Her views have been consistent over time recently. But they are inconsistent with views that she held for many years. It is not clear to me why [Appellant], as her attorney, would not follow her wishes. But he is also aware of her past and the tension that exists between the two granddaughters. . . .

\* \* \*

. . . **It might be very useful for the [GAL] to meet with [L.J.J.] over several sessions over a four-week time frame**, and to review her history, previous decisions and the changes in her wishes recently and to explore what she would like to have happen with her estate after these sessions occur.

\* \* \*

**In conclusion, [L.J.J.] is capable of receiving and evaluating information effectively and making and communicating decision to meet her essential requirements for both her person and her finances. A guardian for her estate is not necessary.**

*See* Dr. Marion's Expert Report at 7-8 (emphases added).

Appellant extrapolates the above language to mean Dr. Marion has

"unequivocally" opined the following:

[L.J.J.] was "vulnerable due to her age", "can be easily influenced", and that both granddaughters "compromised [L.J.J.] by having dual roles with her" and "her income may have become more important to them [the granddaughters], than what is in the best interest of grandmother."

- 17 -

* * *

Dr. Marion also suggested that [R.] be removed from [L.J.J.'s] house as a caregiver and that the [GAL] be directed by the court to interview [L.J.J.] alone, over several sessions during a four-week period away from the influence of either of her granddaughters, specifically [R.] Dr. Marion believed that such an intervention would allow the [GAL] to ascertain [L.J.J.'s] actual desires, free from the clearly conflicted influence of her granddaughters.

. . . Dr. Marion[ found that L.J.J.] was susceptible to influence . .

Appellant's Brief at 11.

We reiterate that the weight of the evidence is for the orphans' court to evaluate in the first instance. *Estate of Duran*, 692 A.2d at 178. Here, the orphans' court considered the various statements in both parties' expert reports, together with Appellant's and L.J.J.'s testimony. The orphans' court was free to weigh Dr. Marion's suggestion, that the GAL "meet with" L.J.J. "to review her history, previous decisions and the changes in her wishes recently," with the opinions, set forth in the same report, that that L.J.J. is not incapacitated, can evaluate information effectively, has unimpaired short-term and long-term memory, and can manage her finances and health care, and that a guardian for her estate is not necessary. *See Estate of Duran*, 692 A.2d at 178; Dr. Marion's Expert Report at 3, 8. The court stated that it understood Appellant's concerns, but found he did not establish any "manipulation," and his "concerns do not rise to the level of the appointment of a guardian under the statute." Orphans' Ct. Op. at 1, 3-4. The court's

conclusion, that Appellant failed to establish incapacity under Sections 5501 (definition of an "incapacitated person"), 5511(a), and 5518 of the Code, is supported by the record. Thus, we do not disturb the court's granting a demurrer and dismissing Appellant's emergency petition. *See Richmond*, 35 A.3d at 783.

## V. Orphans' Court Denial of Further Evaluations of L.J.J.

We address together Appellant's last two issues. He avers the orphans' court abused its discretion and erred in not exercising its powers in equity to direct the GAL to interview and assess L.J.J. Appellant contends the court should "fully explore the evidence, issues, and opportunities for relief in a way that would protect" L.J.J. Appellant's Brief at 24. In support, Appellant again argues that Dr. Marion found L.J.J. "was cognitively and memory impaired and subject to influence by both of her granddaughters," and Dr. Marion suggested that the GAL "independently assess [L.J.J.'s] abilities, needs, and wishes." *Id.* at 23. In his final issue, Appellant incorporates these arguments to allege the orphans' court should have ordered an independent evaluation under Section 5511(d) of the Probate, Estates and Fiduciaries Code. We conclude no relief is due.

First, we note Section 5511(d) provides the following:

**Independent evaluation. —** The court, upon its own motion or upon petition by the alleged incapacitated person for cause shown, shall order an independent evaluation which shall meet the requirements of section 5518 (relating to evidence of incapacity). The court shall give due consideration to the appointment of an evaluator nominated by the alleged incapacitated person.

20 Pa.C.S. § 5511(d).

We reiterate that the orphans' court initially granted Appellant's motion for reconsideration and directed the GAL to meet with L.J.J. and "assess her judgment, insight, memory, and overall capacity, and shall, as suggested by [Dr. Marion's report,] assess her susceptibility to influence by her granddaughters or any other person." Order, 10/20/20. However, following an additional hearing on January 14, 2020, the court denied ultimately Appellant's emergency petition.

We incorporate our above discussion, and conclude the orphans' court did not err in denying Appellant's request for further evaluations of L.J.J.

## VI. Conclusion

We affirm the orphans' court January 21, 2021, order, which denied Appellant's emergency petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/20/2021